UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

FELICIA FIELD,                          :

                      Petitioner,        :

        -against-                       :

                                :

ELAINE LORD, Superintendent,            :
Bedford Hills Correctional Facility,    :

                      Respondent.        :

-------------------------------------------------------------x

**MEMORANDUM & ORDER**

05-CV-0564 (ENV)

**VITALIANO, D.J.**

      Petitioner Felicia Field, appearing by counsel, brings this petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, against respondent Elaine Lord, Superintendent of the Bedford Hills Correctional Facility.   Field contends that she received ineffective assistance of counsel, that she was denied her right to confront a key witness, in violation of the Confrontation Clause, and that she was denied her Fifth Amendment privilege against self-incrimination. Respondent argues that Field's claims are procedurally barred and are, in any case, without merit.  For the reasons set forth below, the writ is denied and Field's petition is dismissed.

**Background**

**A. Field's Arrest**

      The evidence adduced at trial established that shortly after 3:00 A.M. on April 28, 2000, cab driver Cesar Lopez was fatally shot in the head while seated in his cab, which was located in East New York, Brooklyn.  (Transcript of Record, People v. Field, Indict. No. 3980/00 (Sup. Ct., Kings Cty., 2001) ("Trial Tr.") at 312–16.)  The police arrived at the scene after the shooting and found Lopez hunched over the steering wheel.  (Id.)  At 4:25 A.M., Lopez was pronounced dead at a nearby hospital.  (Id. at 317.)

Later that day, Detective Steven Amalfitano, accompanied by other NYPD officers, went to Field's residence, where he asked her to voluntarily accompany him to an NYPD station house for questioning.[1]  (Id. at 211.) Although Field was a suspect, none of the officers revealed that fact to her (id. at 294); nor was she arrested or taken into police custody. (Id. at 212). At the station, Amalfitano was joined by Detectives Thomas Whelan and Anthony Baker. (Id. at 214.) Whelan read Field her Miranda rights from a pre-printed card, which Field signed. She also told Whelan she understood the warnings. (Id. at 215–19). The detectives then questioned Field about Lopez's death for about an hour. During the course of the interrogation, Field recounted the events of the previous night. (Id. at 221.)

Field told detectives that, in the late night and early morning hours of April 27 and April 28, 2000, Field and two of her friends, Tyreek Cross and Charles Rhodes,[2] were in Field's apartment in East New York drinking alcohol and smoking marijuana. (Id. at 219–20.) At about 12:40 A.M., they decided to rob someone and left the apartment. (Id. at 221.) Once outside, Field hailed a cab (id.) and got into the front seat, while Cross and Rhodes sat in the back. (Id. at 236–37). Rhodes initially directed the cab driver, Lopez, to go to Elton Street and Cozine Avenue, but soon thereafter demanded that Lopez pull over and give him money. (Id. at 221; see also Pet. Br. at 9.) Field stated that Cross pulled out a gun and was passing it to Field when it fired accidentally, fatally wounding Lopez in the head. (Trial Tr. at 219–21; Pet. Br. at 9.)

---

[1] No trial testimony divulged how the police connected Field to the killing.

[2] Cross and Rhodes were arrested by NYPD officers on April 28, 2000 based on information provided by Field. (Petitioner's Memorandum of Law, filed on January 1, 2005 ("Pet. Br.") at 9 n. 4; Respondent's Affirmation in Opposition, filed on April 18, 2005 ("Resp. Br.") at 3–4.) They were both offered, and accepted, plea bargains. On December 12, 2000, Cross pled guilty to manslaughter in the first degree and attempted robbery in the first degree. However, the manslaughter plea was subsequently vacated, and on June 25, 2001, Cross was sentenced to a determinate prison term of 12 years for attempted robbery. (Pet. Br. at 1; Resp. Br. at 4 n. 1.) On April 16, 2001, Rhodes pled guilty to attempted murder in the second degree and attempted robbery in the first degree, and was sentenced on May 1, 2001 to two concurrent 12-year terms. Id.

Detectives then asked Field to write down what she had told them, leaving her alone in the interrogation room with a pen and paper. (Trial Tr. at 223.) A short time later, they "checked in on her to make sure everything was okay" (id.), but "she had stopped writing, and she indicated that her statement was incomplete." (Id. at 225.) Field "wasn't happy with the way [her statement] was at that point and she wanted to start over." (Id.) After partially drafting her statement a second time, Field again stopped and started over. (Id. at 228, 230, 234.) Field was satisfied with her third draft, and signed it as a complete account of the killing. (Id. at 235–36, 238.) However, Detective Amalfitano "felt there were some points that needed clarification":

> [Field] had indicated that the cab driver was shot as the gun was being passed from Tyreek [Cross] to her, from the back towards the front, and it didn't . . . seem consistent with the injuries sustained by the victim . . . . I asked her to be completely totally honest with us so we could get her account of the incident exactly the way she remembers it happened. And she indicated at that point that she would like to amend her statement and change two points.

(Id. at 236–38.) Field then changed her statement to reflect, (1) that when the three first left her apartment, Cross and Rhodes were scared to carry the gun, so she carried it, and (2) that during the robbery, she was passing the gun to Cross, and not vice-versa, when it fired. (Id. at 238.) After completing her written statement, at approximately 9:55 P.M. on April 28, Field gave a videotaped statement to Assistant District Attorney Peggy Hoffman. (Id. at 185–86; Pet. Br. at 10; Resp. Br. at 3.)

## B. Field's Criminal Trial

Field's jury trial began in Kings County Supreme Court before Justice Joel M. Goldberg on June 4, 2001 and lasted 13 days. The People presented, among other evidence of Field's guilt, the following: (1) Amalfitano testified as to Field's oral and written statements to police

3

(Trial Tr. at 219–38); (2) the videotaped interview of Field's confession to ADA Hoffman was played for the jury (id. at 186–88); (3) Dr. Mark Janoson, a psychologist who testified as to Field's mental competence to knowingly waive her Miranda rights, described, on cross-examination, a vision Field had of Lopez begging her not to kill him (id. at 583); and (4) Dr. Kathy Yates, a psychologist who was called as an expert witness for the prosecution to rebut the testimony of Dr. Janoson as to Field's mental competence, testified that, in an unguarded moment, Field told her she "wish[ed] [she] hadn't done this crime." (Id. at 732).  Additionally, in a matter of hot contenting, after finding that Field had wrongfully procured the absence of her step-sister and roommate, Amanda Droz, the trial court allowed Droz's grand jury testimony into evidence, in which Droz stated that Field had admitted to shooting Lopez (Justice Goldberg ruled that Field, through her misconduct, had forfeited her right to confront and cross examine the witness who had testified against her). (Id. at 459).  No forensic evidence linking Field to the crime was proffered.[3]

Petitioner's defense was that she was mentally retarded, and, therefore, not capable of competently and knowingly waiving her Miranda rights, making her inculpatory statements to the police and prosecutor involuntary. (Id. at 841–42.) Defense counsel also argued that Field's cognitive deficits made her susceptible to "admit[ting] to something that she didn't do," (id. at 854), and, as a result, she falsely confessed to satisfy the expectations of the authority figures who were questioning her (id. at 857).  The only witness Field offered was Dr. Janoson, who testified to her mental condition. (Id. at 472.)

---

[3] Other police officers on the case testified that they conducted various tests and found no forensic evidence linking petitioner to the crime. (Trial Tr. at 57–114.) There was, however, corroborating evidence from the eyewitness testimony of Yvonne Gardner, who lived near Elton Street and Cozine Avenue. (Id. at 114–15.) She testified that at the time of the shooting, she had been sitting on her stoop when saw a livery cab drive by and recognized the silhouette of a woman sitting in the front seat. (Id. at 124.) She next heard a loud sound, then a woman scream, "Oh my God," (id. at 121), which matched Field's account of what she said after the shot. (Pet. Br. at 62).  Gardner then saw a woman running from the cab. (Trial Tr. at 120.)

1. Psychiatric Evidence

In support of Field's defense that she was incapable of competently and knowingly waiving her <u>Miranda</u> rights, Dr. Janoson testified that Field was "a very psychiatrically disturbed individual," (<u>id.</u> at 492), who scored below 98 percent of the country on an IQ test, (<u>id.</u> at 495), putting her "solidly in the mentally retarded range" (<u>id.</u> at 489). He concluded that Field did not have the requisite competence to knowingly and intelligently waive her <u>Miranda</u> rights. (<u>Id.</u> at 503.) Dr. Janoson stated that, given her intellectual deficits and strong emotional need for affirmation, Field was a "very dependent person" who was "susceptible to coercion." (<u>Id.</u>) Dr. Janoson also testified that, during his interview with Field, she said she told "them what they wanted to hear." (<u>Id.</u> at 611.)

On cross-examination, though, the prosecutor elicited from Dr. Janoson testimony regarding an interview Dr. Janoson conducted with Field's aunt as part of his evaluation of Field. (<u>Id.</u> at 583.) The aunt had told Dr. Janoson that two or three days after the shooting, her niece described a nightmare in which "the victim was sitting in [Field's] room. He was crying. Tears came out of his eyes, waving his hand in the air, saying, 'Don't kill me. Don't kill me.' She told me the man keeps coming around and bothering her. She can't get no sleep. The man wouldn't leave her room. She saw blood coming down his face in her bedroom." (<u>Id.</u> at 583, 589–90.) Defense counsel did not object to the prosecutor's eliciting this testimony, nor was there a request for a limiting instruction as to its use.

To rebut the defense's claims about petitioner's mental condition, the state offered the testimony of psychologist Dr. Kathy Yates. Dr. Yates spent about five hours interviewing Field to assess her condition. (<u>Id.</u> at 700.) She testified that Field did not meet the criteria for mental retardation and was, therefore, mentally fit to voluntarily waive her <u>Miranda</u> rights. (<u>Id.</u> at 699–

5

700.) Dr. Yates further explained that she had asked Field generally whether she was sorry for anything or felt guilty about anything in her life, to which Field had responded, "I wish I hadn't done this crime." (Id. at 732.) Defense counsel did not object to this testimony, nor request a limiting instruction. (Id.)

During summation, defense counsel emphasized that no evidence other than Field's words connected her to the crime, and that she was not mentally fit to knowingly and intelligently waive her Miranda rights. (Id. at 865.) He also asserted that Field admitted to a crime she had not committed "because of the many psychological . . . deficits she operates with." (Id. at 866.)

In his closing, the prosecutor assailed Dr. Janoson's credibility, (id. at 873), and pointed to Field's numerous confessions. In particular, he highlighted Field's wish, revealed to Dr. Yates, that she "hadn't done this crime," (id. at 910), and once again described Dr. Janoson's testimony about Field's nightmare that had been related to him by Field's aunt (id. at 913). Defense counsel did not object. (Id.)

As part of its charge to the jury, the court instructed that the jury should give weight to Field's various statements only if they found the statements to be voluntary and truthful. (Id. at 940.) The court further instructed the jury that petitioner's statements to the police and ADA Hoffman should be considered involuntary under the law if they found they were obtained in violation of the Constitution's Miranda requirements. (Id. at 942–43.) With respect to petitioner's incriminating statements related to Drs. Janoson and Yates, the court stated:

> . . . I gave certain instructions concerning the administration of Miranda rights, and of course that wouldn't apply to any statements the defendant made to either of the doctors, since they were examining the defendant in preparation for trial, and the law just doesn't require that, so the Miranda rights issue really pertains to statements [made to the police and prosecutor].

6

(<u>Id.</u> at 975–76.) Defense counsel did not object. (<u>Id.</u>)

    2.  <u>Field's Statements to Amanda Droz</u>

    At the time of the incident and of her arrest, Field was living in housing owned by her father, William Kennedy. (<u>Id.</u> at 386.) Kennedy lived with Evelyn Jackson in another apartment in the same building. Field shared her apartment with Jackson's 15-year-old daughter, Amanda Droz. (<u>Id.</u> at 385–87.) Field and Droz considered themselves to be step-sisters. Droz's grand jury testimony revealed that Droz was in the apartment she shared with Field on the night of the incident, but did not participate in the decision of Field, Cross and Rhodes to rob someone. (<u>Id.</u> at 451–54.) Droz also testified before the grand jury that Field, Cross and Rhodes returned to Field's apartment after Lopez had been shot (<u>id.</u> at 455–56), and when Droz asked Field what happened, Field told her that she accidentally shot the person they had intended to rob. (<u>Id.</u> at 455–56, 59.) According to Droz, Field said: "I didn't mean to do it. I am sorry. I was scared. I felt sorry for his family." (<u>Id.</u> at 459.)

    The prosecution intended to call Droz to testify at Field's trial, and previewed Droz's testimony during its opening statement on Tuesday, June 5, 2001. (<u>Id.</u> at 34–35.). On Wednesday, June 6, 2001, the prosecutor supplied Kennedy with a subpoena compelling Droz, his step daughter, to appear in court on Thursday, June 7, 2001 at 10 A.M.[4] (<u>Id.</u> at 251.) However, there was no mention of Droz on the record on Thursday. The trial was then in recess until Monday, June 11, 2001. (<u>Id.</u> at 319.) On Monday, the prosecutor informed the court that he could not locate Droz. (<u>Id.</u> at 323.) The prosecutor also informed the court that Jackson, Droz's mother, had been ordered on Friday, June 8, 2001, by a different judge, to produce Droz in court to testify on Monday morning. (<u>Id.</u> at 366.) Thereafter, in response to questions from the

---

[4] At the time of Field's trial, it appears that Droz was living with Jackson and Kennedy. (Id. at 385–87.)

court, Jackson stated that Droz had run away four days prior, on Thursday, June 7, 2001, because she did not want to testify, and that she could not be located. (Id. at 367–69.)  Jackson added that Field told her that Field hoped Droz would not come to court, though Jackson denied relaying that information to Droz. (Id. at 376–78.)  The People moved for a Sirois hearing.[5]  (Id. at 382.)

Three witnesses, Jackson, Kennedy, and Court Officer Sergeant Donna Cerillo, testified at the hearing.  Jackson testified that Field had "thousands" of telephone conversations with Droz while Field was in jail awaiting trial (id. at 391), and that Field last spoke to Droz on Tuesday, June 5, 2001, two days before Droz ran away (id. at 396.)  Jackson did not know, she said, the content of that conversation, (id.), but also disclosed that, the day after Droz ran away, Field told Jackson that she did not want Droz to testify. (Id. at 388–89.)  Confirming again that she did not convey this message to Droz, (id. at 389), Jackson later testified that although Field had never directly said so, it was Jackson's belief, based on what she did say, that Field was worried Droz would "snitch." (Id. at 397.)  Asked if, as Droz's mother, she preferred Droz not testify, Jackson said she would have prevented Droz from testifying if she could have, but that, because Droz had already testified before the grand jury, Droz "took it upon her own self and did what she did, leave." (Id. at 391.)

Jackson testified additionally, about a conversation she had had with Kennedy regarding whether Droz would testify.  She explained that Kennedy told her on the night of June 5, 2001

---

[5] At a Sirois hearing, New York state's equivalent of a federal Mastrangelo hearing (United States v. Mastrangelo, 693 F.2d 269 (2d Cir. 1982)), the court determines whether a defendant has forfeited her right to confront a witness by "misconduct [that] has induced a witness'[s] unlawful refusal to testify at trial or has caused the witness'[s] disappearance or demise." Holtzmann v. Hellenbrand, 92 A.D.2d 405, 415, 460 N.Y.S.2d 591, 597 (1983).  If the court finds that there was such misconduct, the defendant is precluded from objecting, on hearsay or Confrontation Clause grounds, to the admission of the witness's out-of-court statements. Id.

that the prosecution intended to call Droz to testify.[6] (Id. at 394.) She asked Kennedy why, since Droz had already given a statement to the grand jury. Kennedy replied that he did not know. (Id. at 394.) She said Kennedy then told her, "I really don't care what you do. It is up to you . . . cause he don't want to see no trouble over there with Amanda [Droz] and stuff like that." (Id. at 395.) Asked to clarify what she meant by "trouble," Jackson stated, "[s]nitches get stitches in the projects where we live," and that people in the neighborhood were calling Droz a snitch. (Id.) Jackson said she did not know how her neighbors knew Droz was "snitching," (id. at 396), but she guessed that detectives coming onto her property and banging on Droz's apartment door, attempting to take her to the precinct, may have tipped them off (id. at 397–98). According to Jackson, the fact that "snitches get stitches" was common knowledge in the housing projects. The case pending against Field, Cross, and Rhodes was also widely known in the neighborhood, she said. (Id. at 399.)

When she was called to the stand, Sergeant Cerillo testified that she was standing behind Field in court when Kennedy received the subpoena for Droz on Wednesday, June 6th. (Id. at 412.) Cerillo testified that Field turned toward the spectators, mouthed "no" and shook her head as Kennedy was saying he would "try [his] best" to produce Droz. (Id. at 414.) Cerillo added that, because she was between Field and Kennedy, facing Field, she could not say whether Kennedy saw Field's actions. (Id.)

Testifying at the prosecution's call, (id. at 402), Kennedy stated that he did not recall hearing the opening statements on June 5th or the conversation he had with Jackson about Droz testifying. (Id. at 406–10.) He maintained that he was unaware of the prosecutor's plan to call Droz as a witness until he received the subpoena the following day. (Id. at 406.) Likewise, he

---

[6] Kennedy was present for opening statements which took place that morning. (Id. at 3.) The prosecution stated during its opening that it intended to call Droz. (Id. at 34–35.)

did not recall Field mouthing "no" and shaking her head when he received the subpoena for Droz on June 6th. (Id. at 408.) Kennedy swore that he did not have any conversations with Droz about her testifying. (Id. at 409.) He claimed he gave the subpoena to Jackson rather than telling Droz about it directly. (Id. at 406.) He also testified that he, too, was worried that Droz would "get stitches" if she testified. (Id. at 410.)

There was documentary evidence as well. The People introduced Field's prison phone records into evidence to support the argument that, in the year of Field's pretrial detention, only a handful of calls were placed from Field's prison account to the Jackson-Kennedy household. (Id. at 419–20.) As the trial approached, however, the call volume ticked upward, then increased significantly. (Id. at 419–21.) The People pointed out that, on the evening after opening statements, seven calls were made from petitioner's jail account to the Jackson-Kennedy household. Not one of the calls lasted more than 40 seconds. (Id. at 420–21.) The calls petered out in the following days. (Id. at 421.)

Petitioner did not testify or present witnesses at the Sirois hearing. Her counsel did explain that the Jackson-Kennedy household's phone service had been disconnected from February until early May 2001, which, counsel contended, accounted for the absence of calls from Field to that number during that period. (Id. at 425.)

Based on this evidence, the trial court found that Field had not wanted Droz to testify, had relayed this message to Jackson, and that Jackson had then failed to comply with the subpoena to produce Droz. The court explained:

> [T]he People have sustained, by clear and convincing evidence, that the defendant communicated her desire that [Droz] not testify to Miss Jackson, . . . who is responsible for her producing [Droz], and that by clear an[d] convincing evidence this expression by the defendant played a role in the misconduct of Miss Jackson in not producing her daughter, and the reason why [Droz] is not here is

due to misconduct of Miss Jackson which was instigated by the defendant, in part.

The defendant doesn't have to be the sole reason why a witness doesn't testify. I find the defendant's expression of a desire that [Droz] not testify is a factor by clear and convincing evidence in [Droz] not being here, and by doing that the defendant has forfeited her right to cross-examine [Droz] and the People may introduce her Grand Jury testimony.

(Id. at 438–39.) Thereafter, Droz's grand jury testimony was read to the jury.

### 3. Field's Statements During Jury Deliberations

During its deliberations, the jury requested a readback of Detective Amalfitano's testimony. (Id. at 986.) As the court reporter was reading back the testimony in open court, Field shouted, "I don't want to hear any more. He's fuck'n lying." (Id. at 998.) Although the court warned Field to stop, she continued to shout. (Id.) The court then removed the jury from the courtroom, and, after a discussion with the prosecutor and Field's attorney, instructed the jury in open court to ignore the outburst:

[D]isregard, totally what you just heard. It is not part of the trial. It is not part of the evidence in this case. The defendant had a chance to testify during trial. She chose not to. What you just heard from her wasn't sworn, wasn't subject to any cross-examination by the District Attorney. It's not evidence in the case.

(Id. at 1002.) Defense counsel did not object to this instruction. (Id.)

### C. Field's Conviction and Sentencing

On June 20, 2001, Field was convicted of murder in the second degree (felony murder), in violation of N.Y. Penal Law § 125.25[3], manslaughter in the second degree, in violation of N.Y. Penal Law § 125.15[1], attempted robbery in the first degree, in violation of N.Y. Penal Law §§ 110/160.15, and criminal possession of a weapon in the second and third degree, in violation of N.Y. Penal Law §§ 265.03 and 265.02. (Id. at 1040–43.) Petitioner was sentenced

11

by Justice Goldberg on September 20, 2001 to concurrent sentences of 25 years to life on the felony murder count, 15 years on the attempted robbery count, 15 years on the second-degree weapon possession count, and seven years on the third-degree weapon possession count. (Sentencing Hearing Transcript, People v. Field, Indict. No. 3980/00 (Sup. Ct., Kings Cty., 2001) ("Sentencing Hrg. Tr.") at 23–24.)

D. Post-Trial Procedural History

On direct appeal to the Appellate Division, Second Department, petitioner argued that: (1) the trial court's instruction following her verbal outburst in front of the jury deprived her of her right to a fair trial because it commented adversely on her decision not to testify; (2) she was denied her right to remain silent, a fair trial, and the effective assistance of counsel due to the improper use of psychiatric evidence by the prosecutor, the court's erroneous charge on the admissibility of psychiatric evidence, and her attorney's failure to object to those errors; (3) the court's admission of Droz's grand jury testimony at trial was a violation of her Confrontation Clause rights; and (4) her prison sentence of 25 years to life was excessive. People v. Field, 308 A.D.2d 548, 764 N.Y.S.2d 839 (2d Dep't 2003).

The Appellate Division affirmed. Id. It held that Field's improper instruction claim was unpreserved for appellate review, and that, in any event, the claim was meritless: "[t]he trial court's instruction was an appropriate response to the defendant's attempt to influence the jury during deliberations." Id. at 549. Further, the Second Department held that Field's ineffective assistance of counsel claim was without merit, noting that "defense counsel presented a reasoned theory of defense, effectively cross-examined the People's witnesses, and delivered cogent opening and closing statements." Id. The court found, moreover, the evidence at the Sirois hearing sufficient to show, "under the clear and convincing evidence standard, that the defendant

12

engaged in conduct and acquiesced in the conduct of others on her behalf that caused her stepsister's unavailability to testify at trial." Id. Finally, the Appellate Division upheld the statutory and constitutional appropriateness of Field's sentence. Id.

Field's application for leave to appeal the Appellate Division's decision to the New York Court of Appeals was denied on December 15, 2003. People v. Field, 1 N.Y.3d 571, 775 N.Y.S.2d 788, 807 N.E.2d 901 (2003). Field filed the instant petition for a writ of habeas corpus on January 31, 2005, reiterating all of the claims that she raised on direct appeal, with the exception of her excessive sentence claim. She is currently serving her indeterminate prison term of 25 years to life at Bedford Hills Correctional Facility in Bedford Hills, New York.

**Discussion**

**A. Legal Standards**

1. Substantive Grounds for Habeas Review

Under the Antiterroism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a writ of habeas corpus shall not issue with respect to any claim that was adjudicated on the merits in state court unless the state court's decision: (1) "was contrary to," or involved an unreasonable application of, "clearly established federal law" as determined by the United States Supreme Court, or, (2) "was based on an unreasonable determination of the facts" in light of the evidence presented. 28 U.S.C. § 2254(d) ("§ 2254(d)"); see also Gutierrez v. McGinnis, 389 F.3d 300, 304 (2d Cir. 2004) (describing this standard as "AEDPA deference"). AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons of its determination or refers to federal law in its decision. Harrington v. Richter, 131 S. Ct. 770, 785 (2011); see also Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001). Where AEDPA deference applies, "a

13

state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" Drake v. Portuondo, 553 F.3d 230, 239 (2d Cir. 2009) (quoting 28 U.S.C. § 2254(e)(1)).

For the purposes of federal habeas review, "clearly established federal law" refers to the holdings, as opposed to dicta, of Supreme Court decisions in effect at the time of the relevant state court decision. Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to clearly established federal law" within the meaning of § 2254(d) if it contradicts relevant Supreme Court precedent or arrives at a different conclusion based on "materially indistinguishable" facts. Id. at 405–06. A state court decision involves an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle of the facts of" the case. Id. at 413. In construing and applying federal law, even erroneous state court decisions, if deemed reasonable, will survive habeas review. Id. at 411. The state court decision need not be "so far off the mark as to suggest judicial incompetence" before habeas relief may be granted. Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted). However, a federal court may reverse a state court ruling only where it was "so lacking in justification that there [is no] possibility for fairminded disagreement." Vega v. Walsh, 669 F.3d 123 (2d Cir. 2012) (quoting Harrington, 131 S. Ct. at 786–87).

2. Procedural Default

Federal habeas review is not available where a claim has already been decided by a state court, and the state court's decision "'rests upon a state-law ground that is independent of the federal question and adequate to support the judgment.'" Downs v. Lape, 657 F.3d 97, 101 (2d Cir. 2011), cert. denied, 132 S. Ct. 2439 (2012) (quoting Cone v. Bell, 556 U.S. 449, 465

14

(2009)).  Federal courts may not review state court decisions that rest on an adequate and

independent state procedural ground unless the petitioner can show both "cause" and

"prejudice," or, a fundamental miscarriage of justice.  Fama v. Comm'r of Corr. Servs., 235 F.3d

804, 809 (2d Cir. 2000) (citing Coleman v. Thompson, 501 U.S. 722, 749–50; Harris v. Reed,

489 U.S. 255, 262 (1989)).

## B. Analysis

Field's petition raises three grounds for relief: (1) trial counsel was ineffective; (2) the

trial court deprived petitioner of her Sixth Amendment right to confront a key witness; and (3)

the trial court's jury instructions violated her Fifth Amendment privilege against self-

incrimination.  Respondent argues that the first two claims are meritless, and that the third claim

is not only meritless but was also procedurally defaulted.  Respondent does not challenge the

petition's timeliness[7] or petitioner's exhaustion of her state remedies.[8]

### 1.  The Claim That Petitioner's Trial Attorney was Constitutionally Ineffective

Field argues that her defense counsel was ineffective because:  (1) he failed to object

when the prosecutor used psychiatric testimony as substantive evidence of Field's guilt during

his summation, (2) he failed to request an instruction limiting the jury's consideration of

---

[7] AEDPA applies a one-year statute of limitations to federal habeas petitions brought by state prisoners.  See 28 U.S.C. § 2244(d)(1).  This limitations period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  Id. § 2244(d)(1)(A).  When a defendant does not file a petition for a writ of certiorari with the Supreme Court, the conviction becomes final 90 days after the New York Court of Appeals denies leave to appeal, i.e., when the time for seeking a writ of certiorari has expired.  Thus, Field's conviction became final 90 days after the Court of Appeals denied Field leave to appeal on December 15, 2003.  Field's federal habeas petition was filed on January 31, 2005, within the one-year statutory period prescribed by AEDPA.

[8] A federal court is barred from granting a habeas petition if the petitioner has not exhausted all available state remedies.  Jones v. Keane, 329 F.3d 290, 294 (2d Cir. 2003) (citing 28 U.S.C. § 2254(b)(1)(A)).  "Exhaustion requires a petitioner fairly to present the federal claim in state court."  Jones, 329 F.3d at 294.  The Court notes that all three of Field's claims were fully exhausted in state court.  Field fairly presented all three claims in her direct appeal to the Appellate Division, Second Department, and then sought leave to appeal to New York's high court (which was denied).  See Field, 308 A.D.2d at 548; see also Pet. Br. at A1.

psychiatric testimony to the issue of Field's mental capacity, and (3) he failed to object to the

judge's instruction that statements made by Field to "people who [were] not engaged in law

enforcement" were not subject to <u>Miranda</u> limitations on admissibility. (Pet. Br. at 35–36; <u>see</u>

<u>also</u> Trial Tr. at 942.) Respondent contends that defense counsel "opened the door" for the

prosecutor's use of psychiatric evidence to prove Field's guilt. (Resp. Br. at 2.) Respondent

presses further that, assuming any conduct of Field's trial counsel amounted to ineffective

assistance, such shortcomings of defense counsel's representation did not prejudice petitioner.

(<u>Id.</u>)

        Pursuant to the standard established by the Supreme Court, a petitioner must "meet both a

'performance' test, showing that counsel's representation 'fell below an objective standard of

reasonableness,' and a 'prejudice' test, demonstrating that 'there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different.'"

<u>Palacios v. Burge</u>, 589 F.3d 556, 561 (2d Cir. 2009) (quoting <u>Strickland v. Washington</u>, 466 U.S.

688, 694 (1984)); <u>see also</u> <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1404 (2011), <u>reh'g denied</u>, 131

S. Ct. 2951 (2011) (quoting <u>Richter</u>, 131 S. Ct., at 791) ("[R]easonable probability" has been

defined as "a 'substantial,' not just 'conceivable,' likelihood of a different result."). Because of

the inherently deferential nature of the <u>Strickland</u> standard, "[a] criminal defendant has a high

burden to overcome to prove the deficiency of counsel." <u>Lynn v. Bliden</u>, 443 F.3d 238, 247 (2d

Cir. 2006). For habeas petitioners, this burden is "enhanced by the hurdle posed by the highly

deferential review accorded state court adjudications under [AEDPA]." <u>Mosby v. Senkowski</u>,

470 F.3d 515, 519 (2d Cir. 2006) (quoting <u>Eze v. Senkowski</u>, 321 F.3d 110, 112 (2d Cir. 2003));

<u>see also</u> <u>Pinholster</u>, 131 S. Ct. at 1403 (The standard of review for ineffective assistance claims

16

in the habeas context is "doubly deferential" because courts take a "highly deferential look at counsel's performance through the deferential lens of § 2254(d).") (internal citations omitted).

At trial, petitioner mounted a defense keyed to showing that mental defects made her inculpatory statements to the police and prosecutor unreliable. She was interviewed by defense expert, Dr. Janoson, to lay a foundation for such a claim, which triggered the interview of Field by prosecution expert, Dr. Yates. During cross-examination, Dr. Janoson described in vivid detail how petitioner had told her aunt that a bloodied Lopez appeared in her room, begging her not to kill him. Dr. Yates, during her testimony, said that she had asked Field generally if she regretted anything in her life, and she responded that she "wish[ed] [she] hadn't done this crime." During his summation, the prosecutor emphasized both of these declarations by Field— statements that would not have been made but for the mental capacity attack on the credibility of Field's inculpatory statements. (Trial Tr. at 909, 913.)

The slate of controlling law is well chalked. In <u>Estelle v. Smith</u>, 451 U.S. 454 (1981), the Supreme Court held that the prosecutor's presentation of psychiatric testimony, where the examination was performed by a state psychiatrist at the request of the trial judge, and the defense had not asserted the insanity defense or offered psychiatric evidence of any kind at trial, violated the Fifth Amendment. The Court acknowledged that, in other situations, the prosecution may have an interest in introducing psychiatric evidence to rebut claims made by the defense. And, in a subsequent case, the Court held that "if a defendant . . . presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from reports of the examination that the defendant requested." <u>Buchanan v. Kentucky</u>, 483 U.S. 402, 422–23 (1987). However, an important fact noted by the <u>Buchanan</u> Court was that the rebuttal evidence

17

offered by the prosecution in that case did "not describe[] any statements by [the defendant] dealing with the crimes for which he was charged." Id. at 423 (emphasis in original).

Here, the prosecutor used evidence presented by psychologists Drs. Yates and Janoson, not only to rebut petitioner's claim that she lacked capacity to waive her Miranda rights, but as substantive evidence of her guilt as well. In his summation, the prosecutor observed that Field's admission to Dr. Yates was even "more" evidence of her guilt (in addition to Field's other inculpatory declarations) (Trial Tr. at 909), and, in fact, that the jury should credit the truth of this statement in particular because Dr. Yates "caught her in [an] unguarded moment." (Id. at 913.) The prosecutor added that "[e]ven Dr. Janoson, good old Dr. Janoson, indirectly also proves [Field's] guilt." (Id.) Defense counsel could have objected to the prosecutor's improper use of the psychiatric testimony for going beyond the subject of the mental status defense that opened the door to such testimony. See Buchanan, 483 U.S. at 424.[9] Gamely, respondent confects an explanation for defense counsel—that he did not object because he knew he had "opened the door" through his own improper use of the psychiatric evidence. (Resp. Br. at 2, 5.) The offer, however, is without merit.

Perhaps, though, even respondent has sold trial counsel's decisions short. It is possible that defense counsel did not object to the testimony from Drs. Janoson and Yates, as petitioner claims he should have, because he considered the evidence to be helpful on balance. In fact, on cross-examination, Dr. Yates admitted that Field's statement that she wished she "hadn't done this crime" might not have been an admission of guilt for killing Lopez at all. (Id. at 769–70.)

---

[9] Petitioner also observes that "[t]he principle that a defendant who intends to offer psychiatric testimony must make a limited waiver of her privilege against self-incrimination, but that that waiver does not permit the use of any statements of the defendant on guilt" exists in New York law as well, which, petitioner argues, gave defense counsel an additional basis for objecting to the way in which psychiatric testimony was used at Field's trial, and, therefore, lends support to her claim that counsel was ineffective. (Pet. Br. at 38.)

18

Counsel asked Dr. Yates to explain exactly what Field told her. Dr. Yates testified that Field stated, "I wish I hadn't done this crime," and then, when Dr. Yates asked Field what she meant by that, Field said: "I wish I wasn't involved, because I could be at home, not in jail. I wish I would have gone to school, because I probably wouldn't be here." (Id. at 769.) Defense counsel then inquired: "Doctor Yates, did you ever consider the possibility that what Miss Field meant [was that] she wished she hadn't been involved, that she wished she hadn't been arrested, that she wished she hadn't been sitting in front of you having to undergo this evaluation? Did you ever consider that possibility?" (id. at 770), to which Dr. Yates replied, "Sure." (Id. at 770.) All of it, more to the point, might comfortably fit in with the overall defense attack on the voluntariness of Field's inculpatory statements—that is, offering further proof that Field would say whatever she thought an authority figure wanted to hear whether it was true or not.

A similar argument can be made with respect to Dr. Janoson's testimony about Field's vision of the bloody victim. First, the vision itself is not actually an admission of guilt, and second, given that counsel was attempting to show Field was incapable, due to mental illness or incapacity, of voluntarily waiving her Miranda rights, he may have adjudged the testimony to be, overall, more helpful than harmful to her defense.

Finally, even assuming, arguendo, counsel acted in a professionally unreasonable manner, a showing of ineffectiveness in and of itself does not win the day; harm must be shown. And, given the overwhelming evidence of petitioner's guilt, Field cannot show such prejudice. Aside from the nightmare tale and Field's generalized admission to Dr. Yates, the record is replete with numerous detailed admissions to police officers, as well as her videotaped confession that she had the gun, that it discharged, that the round killed Lopez, and that it all happened during the course of a robbery she was committing. Indeed, Field's own words are so

19

damning, they led to the (unsuccessful) "Hail Mary" mental status defense in the first place.  In short, petitioner cannot succeed on the ground that these presumptive mistakes of her counsel "undermine[d] confidence in the outcome" of the trial (Strickland, 466 U.S. at 694).  Even more dispositively, given this record, the Court cannot conclude that the Appellate Division's decision to that effect was an unreasonable application of Buchanan and Strickland.

As for Field's claim that trial counsel was constitutionally deficient for failing to request a curative or limiting instruction, at bottom, petitioner is correct that defense counsel never specifically requested, nor did the court give, an instruction that the testimony of Drs. Janoson and Yates could not be used on the ultimate question of guilt or innocence, though, defense counsel was not standing idly by.  Indeed, in response to defense objections, the trial court gave an abbreviated limiting instruction that some of the testimony of Dr. Yates (Trial Tr. at 706), and by extension Dr. Janoson (id. at 698), was only to be considered by the jury in connection with the formulation and reliability of their expert opinions (id. at 698, 706).[10]  In any event, the overwhelming evidence of petitioner's guilt remains a bar to her making the required showing of

---

[10] Counsel first objected to Dr. Yates' testimony about her interviews with NYPD officers on the subject of Field's arrest (id. at 694), and although he overruled the objection (id. at 695), the trial judge agreed to give the jury the following general, limiting instruction on the admissibility of expert evidence:

> It's common and accepted for experts to not only tell the jury their opinion, but the reasons for their opinion, and many times the reasons for their opinion are based on conversations they've had with other people, because it is the basis of their conclusion.
>
> They don't necessarily know, of their own knowledge, whether or not what people are telling them is true or false.
>
> That applies not only, as I said, to what Dr. Yates is testifying to, but previously what Dr. Janoson is testifying to.  Please bear that in mind.  When you heard testimony about these witnesses, about conversations they had with other people, it is solely because it may be the basis for their conclusions, not necessarily whether or not what they're being told is true or false.

(Id. at 698.) Defense counsel raised the same objection some time later (id. at 705), and again, the trial judge instructed the jury that they were entitled to hear about Dr. Yates' interview with NYPD officers because it was "the basis for [her expert] opinion" but that the evidence was offered "for that purpose only."  (Id. at 706.) Counsel also objected when the prosecutor asked Dr. Yates if, during their interview, Field made contradictory statements about whether or not she was given Miranda warnings by police (id. at 734), and when the People questioned Dr. Yates about Field's criminal history (id. at 740).

prejudice under Strickland, or demonstrating that the decision of the state courts to that effect was objectively unreasonable.

With regard to counsel's failure to object to the charge that Field's statements to "people . . . not engaged in law enforcement" were not subject to the strictures of Miranda, it is far from clear that there was anything for counsel to object to. The first Miranda instruction was given principally in relation to Field's statements to Amanda Droz and, as such, was essentially correct:

> I am now going to give you certain instructions concerning Miranda rights. This law applies to when someone under arrest or in custody is questioned by law enforcement officials. It follows, therefore, that Miranda rights do not have to be given by people who are not engaged in law enforcement. Therefore, the statement the defendant allegedly made to Amanda Droz did not require that Miranda warnings be given to her.

(Trial Tr. at 942 (emphasis added).) Later, the prosecutor requested that the judge give the same instruction with respect to Dr. Yates because, he argued, her interview with Field occurred as a result of Field "asserting [a mental capacity] defense, and, therefore [Miranda] rights aren't required." (Id. at 975.) Defense counsel did not object, and the judge instructed the jury on Miranda for a second time as follows:

> I gave certain instructions concerning the administration of Miranda rights, and of course that wouldn't apply to any statements the defendant made to either of the doctors, since they were examining the defendant in preparation for trial, and the law just doesn't require that, so the Miranda rights issue really pertains to statements the police made and the prosecutor in this case.

(Id. at 975–76.) Whether clumsy or not, the trial court's instruction that Miranda did not apply to the statements made to the psychologists appears to be a shorthand reference to Field's limited waiver of her Fifth Amendment privilege against self-incrimination, which occurred, under both state and federal law, when she placed her mental status in issue.[11] As such, the charge did not,

---

[11] See supra note 9 and accompanying text.

21

as petitioner contends, amount to the court "advising the jury that these statements "were evidence admissible on [the issue of Field's] guilt" (Pet. Br. at 36) or "licens[ing the prosecutor's improper] use" of the evidence in his rebuttal (id. at 41). In other words, apart from defense counsel's failure to request, and the court's failure to give, an instruction limiting the use of the testimony elicited from the psychologists, as discussed above, counsel's conduct reflects no ineffectiveness. Accordingly, petitioner has failed to demonstrate that the Appellate Division's conclusion that she was "meaningfully represented" at trial was unreasonable.

    2.  <u>Claim That Petitioner's Confrontation Right Was Violated</u>

      Field next argues that she was deprived of her Sixth Amendment right to confront Amanda Droz. She challenges the admission of Droz's testimony under both § 2254(d)(2) and (d)(1). (Pet. Br. at 52–53.) First, she claims that the state court's finding that she procured Droz's absence was an "unreasonable determination of the facts in light of the evidence presented." See § 2254(d)(2). Second, she contends that the holding of the state courts that she waived her right to confront Droz, was an "unreasonable application of[] clearly established [f]ederal law." See § 2254(d)(1). Respondent maintains that the factual findings of the trial court, affirmed on appeal, are entitled to AEDPA deference, and that the state courts did not unreasonably apply federal law in so holding. (Resp. Br. at 14.)

      The first question is whether the conclusion that Field procured Droz's absence was "unreasonable . . . in light of the evidence presented." In fact, the trial court was alert to the issue. It observed that Field's case was "different from [those] previously decided," because, unlike in previous cases, the "reluctant witness" (in this case Droz) gave no testimony explaining why she was unavailable to testify at trial. (Trial Tr. at 434.) The absence of such testimony, of course, did not relieve the court of its obligation to rule on the facts that were presented, and it

22

went on to conclude that Field was, at least "in part," responsible for Droz's absence. (Id. at 438.) The court found that Field had communicated a desire that Droz did not testify to the absent witness's mother (Jackson), and that this desire was communicated by Jackson to Droz, which contributed to Droz being unavailable at trial. (Id. at 438.) Specifically, the court ruled:

> Whether [Droz] would have left on her own, or whether [Droz] would have left at the encouragement of [] Jackson, even without [Field's] desire being communicated to [Droz], is something perhaps we won't know, but [the court finds] that the People have sustained, by clear and convincing evidence, that [Field] communicated her desire that [Droz] not testify to [] Jackson, who is responsible . . . for [] producing [Droz], and that by clear an[d] convincing evidence this expression by [Field] played a role in the misconduct of [] Jackson in not producing her daughter, and the reason why [Droz] is not here is due to misconduct of [] Jackson which was instgated by [Field], in part.

Id.

Petitioner strenuously assails the sufficiency of the evidence upon which the trial court relied. She points to the stark evidentiary disparity between her case and People v. Geraci, 85 N.Y.2d 359, 369–70, 625 N.Y.S.2d 469, 475, 649 N.E.2d 817, 822 (1995), in which the defendant was out on bail when the witness was intimidated, and in which there was evidence that showed the witness was to receive payments from the defendant during the duration of the trial in exchange for not testifying. Petitioner also contrasts her case with People v. Cotto, 92 N.Y.2d 68, 76–77, 677 N.Y.S.2d 35, 39, 699 N.E.2d 394, 398 (1998), in which proof existed that the witness had been threatened, and evidence linked the threats to the defendant, who was out on bail when the threats were made.

It hardly bears repeating, but the scope of federal habeas review after AEDPA is extremely narrow. The fact-findings of a state court are guarded by a "presumption of correctness," which is "particularly important when reviewing the trial court's assessment of witness credibility." Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003). Such findings of the

trial court cannot be reversed or set aside without a showing that "the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." Id. (citing Miller–El v. Cockrell, 537 U.S. 322, 340 (2003). No such showing has been made by petitioner. The short of it is, as a result of its assessment of the credibility of Jackson's testimony, the court concluded Field had a significant role in procuring the absence of Droz with the concurrence of Jackson. Moreover, there was evidence that Field not only acted with the help of Jackson to procure Droz's absence, but that she also had the opportunity to procure Droz's absence herself. The People presented documentary evidence of phone calls between Field (in prison) and the Jackson-Kennedy-Droz household. (Trial Tr. at 419.) Furthermore, Jackson testified that Field had had "thousands" of telephone conversations with Droz while Field was in jail awaiting trial (id. at 391), including a conversation on Tuesday, June 5, 2001, two days before Droz ran away (id. at 396). Although Jackson did not know the content of that conversation (id.), at the very least it demonstrates Field had the opportunity to procure Droz's absence, and gives the trial judge a reasonable basis for concluding that she did, in fact, do just that.

Whether a threat of bodily harm, the presence of a reward, or something in between, when a defendant in a criminal case acts to help procure the unavailability of a prosecution witness, that conduct is unlawful. The trial court found clear and convincing evidence of it, and with no showing here by clear and convincing evidence to the contrary, on habeas review, that factual finding is entitled to deference. The Appellate Division then upheld the trial court's ruling, finding that it was not "an unreasonable determination of the facts in light of the evidence presented." Field, 308 A.D.2d at 548.

The second question is whether the state courts unreasonably applied federal law in holding that Field's confrontation rights were not violated. Although the Sixth Amendment

24

generally bars the admission of out-of-court statements without an opportunity for cross-examination, the Supreme Court has also recognized that, in limited circumstances, a defendant's misconduct can constitute a waiver or forfeiture of her Confrontation Clause right. See, e.g., Illinois v. Allen, 397 U.S. 337, 342–43 (1970). However, the Supreme Court has not formally expounded a position on "the circumstances sufficient, or the standard of proof applicable, in analyzing waiver cases under the Confrontation Clause." Cotto v. Hebert, 331 F.3d 217, 234 (2d Cir. 2003); see also Davis v. Washington, 547 U.S. 813, 833 (2006) (the Court has taken "no position on the standards necessary to demonstrate . . . forfeiture [of the right of confrontation].").

In this case, petitioner, citing Second Circuit precedent, argues that under federal law, a valid waiver can occur only where "a witness' silence is procured by the defendant himself, whether by chicanery, by threats, or by actual violence or murder . . ." (Mastrangelo, 693 F.2d at 272–73) (internal citations omitted) (emphasis added). There must be a "knowing and intentional" relinquishment by the defendant of her Confrontation Clause right (Cotto, 331 F.3d at 234). The state courts' conclusion that Field herself knowingly and intentionally procured Droz's absence, petitioner contends, was an unreasonable application of law to facts because the only evidence before the courts was that Field had a desire that Droz not testify and that she expressed that desire to Jackson.

However, since the Supreme Court has explicitly declined to specify the type of "misconduct" that is sufficient to warrant forfeiture of a defendant's Confrontation Clause rights, this Court cannot find that the state courts at the time of the decision "unreasonably" applied "clearly established federal law." In any event, assuming, arguendo, that the principles

25

articulated in the Second Circuit's decisions were controlling under AEDPA,[12] the state courts found, in fact, that Field herself engaged in "chicanery,"[13] as required for a valid finding of waiver according to Second Circuit precedent. If Field had merely had the desire that her step sister not testify, then, perhaps, the decision of the trial court could be considered unreasonable. In fact, however, Jackson explicitly stated that she knew Field did not want Droz to testify, and although Jackson denied communicating the information to Droz, the trial judge did not believe Jackson's testimony on this point.[14] Moreover, the existence of the numerous phone calls between Field and Droz at or around the beginning of trial and her communicated desire to Kennedy and Jackson that Droz not testify gave Field motive and opportunity to deliver that message directly to Droz. Simply put, there was abundant evidence to permit the trial court to draw this precise inference. Consequently, the Court concludes that the state courts' determination that Field's misconduct, with the connivance of her step mother, procured the absence of her step sister at trial and thereby forfeited her Sixth Amendment confrontation right, was not an "unreasonable application" of clearly established federal law.

3. Claim That Petitioner Was Denied Her Privilege Against Self-Incrimination

Field's final claim is that the trial court deprived her of her privilege against self-incrimination, in violation of the Fifth and Fourteenth Amendments, when, in response to Field's verbal outbursts, the trial judge instructed the jury: "The defendant had a chance to testify at

---

[12] Cotto, 331 F.3d at 234-25 ("Every circuit that has resolved the question has recognized the principle of forfeiture by misconduct, although the tests for determining whether there is a forfeiture have varied.") (citing Fed. R. Evid. 804(b)(6) Advisory Committee's Notes to 1997 Amendment).

[13] Chicanery is defined as "deception or trickery." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/chicanery (visited Sept. 29, 2013). The People explicitly argued to the trial court that Field engaged in "chicanery" to procure Droz's absence. (Trial Tr. at 430.)

[14] Based on the fact that Jackson did not file a missing person report until days after Droz went missing, the trial judge concluded that Droz "left home with the knowledge . . . [and] encouragement of [] Jackson." (Trial Tr. at 437.)

trial. She chose not to testify." Petitioner argues that this statement prejudiced the jury by casting a negative inference on her choice not to testify. Respondent replies that the Court may not review this claim because it is procedurally barred, and that, if reviewable, it is without merit.

The Appellate Division found that this claim was "unpreserved for appellate review," Field, 1 N.Y.3d at 571, 775 N.Y.S.2d at 788, implicitly relying, as do a legion of other cases, on New York's contemporaneous objection rule, codified in New York Criminal Procedure Law ("CPL") § 470.05(2). The statute gives an appellate court discretion to decline to review claims that were not sufficiently presented to or ruled upon by the trial court. The parties do not dispute that the Appellate Division rejected Field's claim on the basis of an independent state procedural ground.[15] However, they disagree about whether the state procedural ground is "adequate" to bar collateral review in this case.

Petitioner urges that, despite the Appellate Division's professed reliance on what is an independent state procedural rule, this Court may nonetheless review Field's claim because the Appellate Division "unevenly applied New York's contemporaneous objection rule." (Pet. Br. at 70.) She contends that "[t]he rule in New York State has long been that no objection by defense counsel is necessary to preserve [this type of] issue for appellate review." Id. at 70–71 (citing People v. McLucas, 15 N.Y.2d 167, 172, 256 N.Y.S.2d 799, 802, 204 N.E.2d 846, 848 (1965)). In an homage to subsequent history, Respondent argues that the broad McLucas rule was

---

[15] The Court notes that for the purposes of federal habeas review, the Appellate Division's decision is one based on an independent state ground notwithstanding its additional ruling that, "[i]n any event, [the defendant's Fifth Amendment claim] is without merit." Field, 1 N.Y.3d at 571, 775 N.Y.S.2d at 788; see Harris v. Reed, 489 U.S. 255, 264 n. 10 (1989) (stating that "a state court need not fear reaching the merits of a federal claim in an alternative holding" because the independent and adequate state ground doctrine "curtails reconsideration of the federal issue on federal habeas as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision") (emphasis in original); see also Slavin v. Artus, No. 05-CV-0870, 2010 WL 185108, at *10 (E.D.N.Y. Jan. 8, 2010) ("[E]ven when a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted.") (quoting Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005)).

27

modified by the New York high court in People v. Autry, 75 N.Y.2d 836, 839, 552 N.E.2d 156 (1990), which held that the preservation requirement, should, in fact, apply to alleged errors in jury instructions implicating a defendant's Fifth Amendment rights, unless, "the language of the charge expressly or at least unambiguously conveys to the jury that the defendant should have testified."[16] The state observes further that the specific rule and exception, as articulated in Autry, has been consistently applied by New York courts, and is, therefore, "adequate." The Court is in accord with respondent's analysis.

Regardless of the rule's current status under state law, the question of its adequacy to bar federal habeas review is a question of federal law. Lee v. Kemna, 534 U.S. 362, 375 (2002). Courts generally assess the adequacy of a state ground of decision by examining whether the rule upon which the state court relied is "'firmly established and regularly followed'" (Walker v. Martin, 131 S. Ct. 1120, 1130 (2011) (quoting Beard v. Kindler, 558 U.S. 53, 54 (2009))), keeping in mind that, in "exceptional cases," the "exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." Lee, 534 U.S. at 376; see also Cotto, 331 F.3d at 239. To determine whether a case involves an exorbitant misapplication of a state rule, courts must examine whether the application of the procedural rule serves a legitimate state interest (Downs, 657 F.3d at 102), and, in doing so, courts should distinguish a state rule that is exorbitantly applied from one that state courts have applied using their discretion. Standing alone, the latter does not render the rule inadequate. "To the contrary, a discretionary rule can be firmly established and regularly followed—even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." Kindler, 558 U.S. 53, 61 (internal quotation marks omitted); accord Walker, 131 S. Ct. at 1128.

---

[16] Petitioner acknowledges that Autry narrowed the McLucas holding. (Pet. Rep. Br. at 14–15.)

At bottom, it is clear that New York has a "firmly established and regularly followed" contemporaneous objection rule, see CPL § 470.05(2), and that federal courts have consistently held this rule to be adequate and independent for the purpose of barring federal habeas review. See, e.g., Wainwright v. Sykes, 433 U.S. 72, 86 (1977) (contemporaneous objection rule is an adequate and independent state ground); Murray v. Carrier, 477 U.S. 478, 485–92, 497 (1986) (same); Kozlowski v. Hulihan, 511 Fed. App'x 21, 25 (2d Cir. 2013) ("We have previously held that New York's contemporaneous objection rule is 'firmly established and regularly followed,' and, therefore, its application ordinarily constitutes an adequate state-law ground for barring federal habeas review."). More on point, the Second Circuit has ruled that failure to properly object to a jury charge is an adequate and independent state ground barring habeas relief. See, e.g., Zarvela v. Artuz, 364 F.3d 415, 418–19 (2d Cir. 2004), cert. denied, 543 U.S. 879 (2004); Franco v. Walsh, 73 F. App'x at 518 (2d Cir. 2003); Reyes v. Keane, 118 F.3d 136, 138 (2d Cir. 1997).

Field hunts for a way out of her procedural cul de sac, and there is, to be sure, a "narrow exception" recognized by courts in New York to the contemporaneous objection rule with respect to Fifth Amendment claims. As previewed above, a criminal defendant's Fifth Amendment claim may be preserved in the absence of contemporaneous objection to a trial court's jury charge, but only so long as an appellate court finds that the judge's instructions "unambiguously convey[ed] to the jury that the defendant should have testified." People v. Autry, 75 N.Y.2d 836, 839, 552 N.E.2d 156, 157 (1990). That this exception exists, however, does not necessarily render the contemporaneous objection rule "inadequate" in the Fifth Amendment context.[17] See Kindler, 558 U.S. 53, 61; Walker, 131 S. Ct. at 1128. Although it is

---

[17] Prior to Autry's clarification and narrowing of the McLucas decision, some Appellate Division opinions seem to imply that New York's contemporaneous-objection requirement did not apply to Fifth Amendment claims. See, e.g.,

true that a state ground may be found inadequate when "discretion has been exercised to impose novel and unforeseeable requirements without fair or substantial support in prior state law . . ." Id., 131 S. Ct. at 1130, in this instance, Field has not demonstrated (nor can she) that the Appellate Division exercised its discretion in a way that was either "novel" or "unforeseeable." In fact, just the opposite is true.  Since Autry, New York courts have consistently applied and enforced the contemporaneous objection requirement in factual situations similar to the case at bar.  See, e.g., People v. Pearson, 271 A.D.2d 203, 706 N.Y.S.2d 37 (1st Dep't 2000) (defendant's claim that he was deprived of his right against self-incrimination by the court stating, in response to defendant's repeated outbursts at trial, "if you want to take the stand and testify, you take the stand and testify," is not exempt from the requirement of preservation, and therefore the claim is unpreserved for appellate review); People v. Simmons, 258 A.D.2d 297, 683 N.Y.S.2d 838 (1st Dep't 1999) ("Defendant's unpreserved contention that the court's instructions to the jury deprived him of his privilege against self-incrimination is not exempt from the requirement of preservation . . . [and w]ere we to review this claim, we would find that the court's curative instruction following defendant's outburst was proper . . . .").

Other federal courts in this circuit that have examined this issue have either declined to pass on the adequacy of the procedural ground as a bar (Pearson v. Greiner, No. 02-CV-10244, 2004 WL 2453929, at *10-12 (S.D.N.Y. Nov. 3, 2004), report and recommendation adopted by, No. 02-CV-10244, Docket #20 (S.D.N.Y., Dec. 16, 2004)), or have held, as this Court does, that New York's contemporaneous objection requirement is "adequate" to bar federal habeas review

People v. Brown, 150 A.D.2d 472, 541 N.Y.S.2d 74, 75–76 (2d Dep't 1989) ("The defendant's challenge to the trial court's instructions to the jury regarding his failure to testify is properly before us.  Although no objection was raised in the trial court, none was required to preserve the issue for appellate review. . . ."); People v. Mannery, 151 A.D.2d 697, 542 N.Y.S.2d 751, 752 (2d Dep't 1989) (trial court committed reversible error with respect to its comments to the jury concerning the defendant's failure to take the witness stand and a contemporaneous objection was not required to preserve the error for appellate review); People v. Soto, 146 A.D.2d 657, 536 N.Y.S.2d 855 (2d Dep't 1989) (same).

30

of a Fifth Amendment claim (Ashley v. Burge, No. 05-CV-4497, 2006 WL 3327589 (S.D.N.Y. Nov. 3, 2006)).[18]

Even assuming, arguendo, however, that Field's Fifth Amendment claim was preserved under Autry, and therefore reviewable, it would fail on the merits. The Supreme Court has held that "the Fifth Amendment in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Griffin v. California, 380 U.S. 609, 615 (1965). In this light, not all comments regarding a criminal defendant's failure to testify rise to the level of a constitutional violation, and, thus, the context in which the comment was made must be examined. In United States v. Robinson, 485 U.S. 25 (1988), for example, defense counsel argued to the jury that the defendant had not been able to "explain" his side of the story. Id. at 27–28. In response, the prosecutor was permitted to note in summation that the defendant could have taken the stand to give his explanation. Id. at 28. The Court held that where "the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege." Id. at 32. Moreover, the Second Circuit has noted that, even in the case of an improper remark by a trial judge, a court must consider whether the remark was "so prejudicial that it denied the defendant a fair, as opposed to a perfect, trial." United States v. Rosa, 11 F.3d 315, 343 (2d Cir. 1993), cert. denied, 511 U.S. 1042 (1994) (internal quotation marks and citation omitted).

The trial court's statement to the jury that the defendant "had a chance to testify at trial" but "chose not to" must be viewed in context—specifically, as a response to Field's own

---

[18] Petitioner's reference to Hawkins v. LeFevre, 758 F.2d 866 (2d Cir. 1985) is inapposite since that case was decided before the New York Court of Appeal's clarification of the McLucas rule in Autry.

31

improper outburst from the defense table that the readback by the reporter was of a witness that had lied on the stand. (Trial Tr. at 1002.) Indeed, Field's outburst was made after the court warned her, before the jury entered the courtroom, that she needed to remain calm. (Id. at 988–89.) During the readback, Field stated out loud in the presence of the jury, "I don't want to hear anymore. He's fuck'n lying" (referring to Detective Amalfitano). (Id. at 998.) When the court asked her to be quiet and said, "Please, Miss Field, I don't want to hear anymore," Field persisted and stated again, "They're fuck'n lying." (Id.) At this point, the jury was removed from the courtroom and a discussion of the outburst took place. In response to a request by the prosecutor for an instruction clarifying that defendant's statements were not testimony entitled to any consideration by the jury, the court ultimately instructed:

> All right, ladies and gentlemen, we're going to continue, but before we do, I'm going to instruct you now of course to disregard, totally, what you just heard. It is not part of the trial. It is not part of the evidence in this case. The defendant had a chance to testify during trial. She chose not to testify.
>
> What you heard from her wasn't sworn, wasn't subject to cross-examination by the District Attorney. It's not evidence in the case. Disregard it.

(Id. at 1001–02.)

Respondent points out that the charge was not an adverse reference to Field's failure to take the stand. Rather, it was simply a legally accurate explanation that Field's unsworn statement could not be considered by the jury as evidence. (Resp. Br. at 27.) Clearly, the explanation related directly, not to the defendant's failure to speak, but to the words she did speak—inappropriately. It was an instruction about how to treat Field's own inappropriate comments to the jury in open court despite the trial judge's prior warnings. There is, however, not the slightest suggestion in the words of the instruction that the jury could rely, in any way, on the fact that Field chose not to take the witness stand in reaching its decision. (Further

32

underscoring the inapplicability of the exception <u>Autry</u> recognized to the contemporaneous objection rule.)  Even if the trial judge's statement to the jury, and its decision to include a reference to Field's choice not to testify, was not perfect, federal law does not require perfection. Beyond cavil, Field has not demonstrated, even in isolation, that the instruction was "so prejudicial" that it deprived her of the right to a fair trial.  <u>Rosa</u>, 11 F.3d at 343.  Worse yet for petitioner, it is a fundamental rule under New York and federal law that a trial judge's instructions to a jury must be viewed in context and as a totality.  The trial judge had already instructed the jury that they could not draw any adverse inference from Field's failure to take the stand.  (Trial Tr. 932.)  Nothing in the court's supplemental "outburst" charge, by what was said or unsaid, undercut that basic instruction.  Thus, the Appellate Division reasoning that the trial court's instruction was an "appropriate response" that "conveyed to the jury the importance of the principle that defendant's unsworn, self-serving factual statements were not evidence" (<u>Field</u>, 1 N.Y.3d at 571, 775 N.Y.S.2d at 788), was not contrary to, or an unreasonable application of, federal law, even if the claim had not been procedurally defaulted.  Petitioner's claim that she was deprived of her privilege against self-incrimination fails procedurally and, like the others, substantively as well.[19]

### Conclusion

For all of the foregoing reasons, Field's writ of habeas corpus is denied with prejudice and her petition is dismissed.  Since Field has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue.  28 U.S.C. § 2253(c)(2). Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a) that any appeal from this

---

[19] So it is plain, the Court finds that the exceptions to the procedural default doctrine do not apply in this case. Field has not shown "cause" or "prejudice" for her default, and since she does not raise a claim of innocence, she cannot demonstrate a "fundamental miscarriage of justice."  <u>See</u> <u>Fama v. Comm'r of Corr. Servs.</u>, 235 F.3d 804, 809 (2d Cir. 2000) (<u>citing</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 749–50; <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989)).

Memorandum and Order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk of the Court is directed to enter judgment and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
September 29, 2013

s/ ENV

ERIC N. VITALIANO
United States District Judge

34